UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | |
|---|---|
| JOHN BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 3:21-cv-162-LCB |
| | ) |
| KILOLO KIJAKAZI, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION & ORDER

John Lister Brown appeals the Social Security Administration Commissioner's decision denying him disability insurance benefits and supplemental income. He contends that Administrative Law Judge James Grimes's decision isn't disabled isn't supported by substantial evidence, that he didn't fully develop the record, and that he used the wrong legal standard to reach his conclusions. (Doc. 18 at 5). The Court disagrees.

Judge Grimes's decision is supported by substantial evidence, his decision is **AFFIRMED**, and Mr. Brown's request for relief is **DENIED.**

### I.   Background

Mr. Brown filed for a period of disability and disability insurance benefits and an application for supplemental security income on August 5, 2019. (Doc. 18 at 1; Doc. 19 at 2). He alleged a disability onset date of March 31, 2013. (Doc. 13-8 at

1

38; Doc. 13-6 at 4, 12). Mr. Brown claimed total disabled because of breathing problems, hearing loss, knee problems, low back pain, vision impairment when not wearing glasses, and eye-burning due to welding. (Doc. 13-4 at 2, 9, 17). Mr. Brown stopped working entirely on December 20, 2017. (Doc. 18 at 2; Doc. 19 at 3).

The Commissioner first denied Mr. Brown's claim on December 3, 2019. (Doc. 13-8 at 38). Mr. Brown filed for reconsideration, which was denied on February 2, 2020. (Doc. 13-8 at 38). He was granted a hearing before Judge Grimes on March 2, 2020, and that hearing was held telephonically on July 1, 2020. (Doc. 13-8 at 38.). Mr. Brown, his counsel, and vocational expert Marcia Shulman were on the call. (Doc. 13-8 at 38). Mr. Brown received Judge Grimes's unfavorable decision on July 10, 2020. (Doc. 13-8 at 35). He appealed. The Appeals Council declined review on December 16, 2020. (Doc. 13-8 at 2).

### A. Hearing Testimony

Mr. Brown received his GED in 1979. After that, he received two years of welding training at Northwest Shoals Community College. (Doc. 13-8 at 62, 65; Doc. 13-7 at 4).

Mr. Brown's testimony during the hearing revealed an extensive work history–indicative of a person who wants to work and actively seeks employment. He's previously worked in the concrete, construction, iron, maintenance, mechanical, and welding industries for, among others, Cates and Puckett

2

Construction, Die Tech, 3M, and Lexicon. (*See* Doc. 13-8 at 58–64). At some of those jobs, he'd lift as much as 100 pounds at a time in materials. (Doc. 13-8 at 61).

Mr. Brown hasn't worked since 2017. He last worked as a laborer in 2017 with Aderholt Masonry. At Aderholt, he'd lift loads weighing between 50–100 pounds all day. (Doc. 13-8 at 65).

Mr. Brown testified that his most serious condition was pain in "his hip . . . and . . . his right side"; that he has numbness that "comes and goes." (Doc. 13-8 at 66). The pain and numbness he experiences radiates down the right side of his back and into his right leg. *Id*. at 67. This, he says, is the main reason he can't work. *Id*. at 67. While Mr. Brown didn't rate his pain on a 1–10 scale during his hearing, he said that he's "had times where [he] was gonna go [to the hospital for treatment] and [he] let it go and [took] a couple of ibuprofen[.]" (Doc. 13-8 at 68). He said he "let it go" and didn't see a doctor because he didn't have health insurance. *Id*. But he also testified that he treats his pain generally with over-the-counter medication. *Id*. at 70.

Mr. Brown testified that his vision and hearing have deteriorated. (Doc. 13-8 at 67). He failed a hearing test in his left ear when he applied to work offshore. *Id*. And he related during the hearing that he "can't hardly see." (Doc. 13-8 at 74). While Mr. Brown can drive cars with automatic and manual transmissions, he prefers not to drive at all because he "can't turn right to look in the traffic." (Doc. 13-8 at 76).

3

Mr. Brown has undergone two arthroscopic knee surgeries. (Doc. 13-8 at 68). The first was performed on his left knee some time in the 1980's. (Doc. 13-8 at 84). He had right knee surgery in 2005. *Id.* at 84. He testified that the surgeries repaired his knees "for the most part" but he still has some trouble with his left knee. *Id.* To that end, Mr. Brown says that his knee pain doesn't affect his ability to sit or stand, though standing for a while bothers his hips and back, as does sitting for a while. (Doc. 13-8 at 69). He testified that he can usually stand for 10–15 minutes at a time before needing to sit again, and that this pain "sometimes" affects his ability to walk. (Doc. 13-8 at 69). But he finds that he can walk 4 blocks before he needs to sit down. *Id.* at 70.

Mr. Brown testified that he had a mild stroke in 2017. (Doc. 13-8 at 80). However, during the hearing, his counsel appeared to concede that Mr. Brown was actually diagnosed with Bell's Palsy–not a stroke. (Doc. 13-8 at 81).

Mr. Brown's pain gives him good and bad days. About half his weekdays are good. The others aren't. (Doc. 13-8 at 70). He said that sometimes he must lie down during the day to alleviate some of his pain–usually two to three times a week. (Doc. 13-8 at 73, 74). On an ordinary day, Mr. Brown walks, gets the newspaper, and does some light housework like vacuuming, dishwashing, and going to the grocery store. (Doc. 13-8 at 78). Mr. Brown's testified that he doesn't lift things if he doesn't have to, but he believed that he could hold 30 pounds in each hand, and that he could carry

between 25 to 30 pounds for up to 2 minutes. (Doc. 13-8 at 71, 72). But he also testified that it was difficult for him to bend over and get milk out of the refrigerator. *Id*.

### B. Medical Records

#### i. Earlier Records

He visited Dr. Lloyd Dyas, MD's office on February 2, 2011, complaining of chronic left knee pain, though he rated his pain score a 2 out of 10 on the visit. (Doc. 13-8 at 7). During his visit, Mr. Brown reported that his knee had hurt the day before, but it didn't hurt "much at all" during his visit. *Id*. Dr. Dyas noted that Mr. Brown had a history of arthroscopic knee surgery and that "there is no history of injury to the knee or new activity that might be related to the pain." *Id*. (cleaned up). Dr. Dyas also noted that Mr. Brown's intravenous and pain medication treatment were effective, *id.*, and he recommended continued conservative treatment. *Id*. at 9.

Mr. Brown had a follow-up appointment to discuss his knee pain at Dr. Dyas's office on May 27, 2011. That day, he rated his pain score at a 3 out of 10. (Doc. 13-8 at 10). Mr. Brown reported that his pain had worsened because he'd taken on more shift hours at work. *Id*. Mr. Brown's assessment from that visit reads as follows: "bilateral patellofemoral pain . . . bilateral chondromalacia patella . . . Bilateral osteoarthritis, localized, primary, lower leg." *Id*. at 13. Mr. Brown's complaints and that assessment notwithstanding, Jane E. Gertz, CRNP noted that Mr. Brown

experienced "an improved quality of life" on his pain medication treatment plan. *Id*. at 14.[1]

Mr. Brown visited Dr. Dyas's office again on August 24, 2011, for another follow-up appointment about his knee pain. (Doc. 13-8 at 15). Mr. Brown rated his pain score a 6 out of 10 at this visit and claimed that his knee pain prevented him from sleeping. *Id*. The notes from this visit indicate that Mr. Brown's pain was affecting his quality of life and that he seemed a little depressed. *Id*. at 17. Mr. Brown received a Cymbalta prescription for his pain and associated depression. *Id*. Notes from that visit also indicate that Mr. Brown's back and joint condition were severe. (Doc. 13-4 at 21).

On October 24, 2011, Mr. Brown returned to Dr. Dyas's office for another follow-up visit. He rated his pain score a 3 out of 10 and reported that the Cymbalta he'd been prescribed helped him. (Doc. 13-8 at 18). Around three months later, on January 17, 2012, Mr. Brown returned to Dr. Dyas's office. (Doc. 13-8 at 21). He reported his pain score at a 3 out of 10 again and reported that he had good and bad days. *Id*. He also reported that he'd changed jobs, and that while it was a little more physically demanding–-and that he'd been experiencing bilateral knee and low back pain–he was coping fairly well with pain management. *Id*. at 21, 23.

---

[1] Dr. Dyas signed this record over one month later. (*See* Doc. 13-8 at 17).

Mr. Brown visited Dr. Dyas's office again on April 10, 2012, reporting 4 out of 10 pain score. He also said that, while he was in "constant pain" he was coping "fair." (Doc. 13-8 at 24). At another visit to Dr. Dyas's office just over a month later, Mr. Brown reported a 4 out of 10 pain score and it was noted that things were "getting a little better for him." (Doc. 13-8 at 73). Three months later, on another follow-up visit, Mr. Brown reported a 4 out of 10 pain score and requested a medication change. *Id.* at 70.

On September 17, 2012, Mr. Brown again visited Dr. Dyas's office, reporting a 2 out of 10 pain score. (Doc. 13-8 at 67). During that visit, he reported that his new medicine "really made a difference." *Id.* Nearly identical notes followed from Mr. Brown's visit to Dr. Dyas's office on December 10, 2012. (Doc. 13-8 at 64).

Mr. Brown reported his highest pain score–7 out of 10–on a follow-up visit to Dr. Dyas's office on March 1, 2013. (Doc. 13-8 at 61). During this meeting, Dr. Dyas noted that Mr. Brown was experiencing a decrease in his range of motion and that he couldn't afford his pain medication. *Id.* at 62. Mr. Brown underwent an MRI at Russellville Hospital on March 14, 2013. (Doc. 13-8 at 57). The MRI revealed the following:

> far left lateral HNP is seen at L5-S1 with obliteration of the neural foramen. There is narrowing of the neural foramen on the right at this level. Prominent bulging disc is seen at L4-5 with resulting spinal stenosis at this level. . . . There is no evidence of marrow replacing abnormality within in the vertebral bodies. . . . Significant bulging disc at L4-5 with resulting spinal stenosis[;] prominent

> bulging disc with far left lateral HNP at L5-S1[;] [and] recommends physical therapy[.]

(Doc. 13-8 at 57, 59). At a follow-up appointment at Dr. Dyas's office one month later, Mr. Brown rated his pain score a 4 out of 10. *Id*. at 56. Mr. Brown's MRI was discussed, and Mr. Brown reported that his back had been feeling terrible. *Id*.

At a June 20, 2013, follow-up appointment, Mr. Brown stated that his pain score had dropped to a 3 out of 10. (Doc. 13-8 at 52). And it was noted that he was "coping well with current pain management and wishes to continue." *Id*. Three months later, Mr. Brown again reported a 3 out of 10 pain score and that after a recent fall, his knee pain had "settled down." (Doc. 13-8 at 48).

Mr. Brown matched his highest pain score on a December 5, 2013 visit to Dr. Dyas's office. (Doc. 13-8 at 26). While several conditions were listed in this visit's notes (and he reported that he couldn't roll over in bed without waking up from pain), he was otherwise "coping well" and wanted to continue his treatment plan. *Id*. During this visit, Nurse Practitioner Jene E. Gertz, CRNP reported that Mr. Brown had been experiencing an improved quality of life and less pain by following his regiment as prescribed. But she also noted that Mr. Brown had discussed "the option at a prior office visit of seeing a spine surgeon," and that Mr. Brown wanted to "avoid surgery at [that] time." (Doc. 13-8 at 29).

On June 25, 2014, Mr. Brown again returned to Dr. Dyas's office, this time rating his pain score a 5 out of 10. (Doc. 13-8 at 34). He said that, while he had a lot

8

of back pain, he had good and bad days and that he was coping well under his pain management plan. *Id*. At a follow-up about two weeks later, Mr. Brown again rated his pain score a 5 out of 10, and again mentioned his lower back and right knee pain, stating the latter was slightly worse. (Doc. 13-8 at 40).

Mr. Brown visited the emergency room at Eliza Coffee Memorial Hospital on December 12, 2017. There, he presented with a non-tender back and non-tender extremities, and a normal range of motion in his back and knees. (Doc. 13-8 at 82).

### ii. Consultative Examinations

During a consultative examination conducted on January 28, 2020, at Tennessee River Urgent Care & Family Practice, Mr. Brown's vision was measured at 20/50 in his right eye and 20/30 in his left. (Doc. 13-4 at 21). Mr. Brown also heard normal conversational tones from 10–12 feet away without any hearing aids, *id*., and he could perform a normal squat. *Id*. He was found to have a normal range of motion in his hip and knees and normal strength, but he had some "mild difficulty" with his left hand. *Id*. X-rays taken during that visit revealed mild to moderate osteoarthritis in his right knee and mild to moderate lumbar scoliosis with left apex at L2–L3 disc spacing and mild osteoarthritis.

Dr. Linda Hogan, MD, determined in her February 12, 2020 consultative exam that:

> imaging shows mild to moderate DJD in lumbar spine. Mild to moderate osteoarthritis in right knee. Normal ROM in all areas . . .

> Normal strength. Cl[ai]m[a]nt does have some hip pain, however, [claimant] has normal [range of motion] in hip, normal strength, and normal squat. [Claimant] does have some old imaging showing DDD in lumbar spine, however, [claimant] states that he is able to clean windows, pick up the yard, mop floors, and take out the trash. He makes simple meals, drives, and shops in stores. He states that he is able to lift 25 – 50 pounds and can walk for 15 minutes without stopping.

(Doc. 13-4 at 26).

### C. Judge Grimes's Decision

As noted above, Judge Grimes issued his opinion on July 10, 2020. (Doc. 13-3 at 35). In it, he followed the sequential framework ALJs must when determining whether an applicant is entitled to Social Security benefits. *Id* at 39.

Judge Grimes first determined that Mr. Brown hadn't engaged in substantial gainful activity since 2017 when he worked at Aderholt Masonry. (Doc. 13-3 at 40). Thereafter, Judge Grimes found that the osteoarthritis in Mr. Brown's knees and spine and his degenerative disc disease in his lumbar spine were severe impairments. He also found Mr. Brown's hearing loss, hypertension, and hyperlipidemia were non-severe impairments. *Id*. at 41.

At step four in his analysis, Judge Grimes found Mr. Brown had the residual functional capacity:

> to perform medium work . . . except that he can . . . never climb ladders or scaffolds. . . . and occasionally stoop, kneel, crouch, and crawl. He can occasionally have exposure to hazards such as unprotected moving mechanical parts and unprotected heights. He can occasionally tolerate exposure to extreme cold. He can only hear and understand simple oral instructions.

(Doc. 13-3 at 42). From pages 43–44 in Doc. 13-3, Judge Grimes discussed Mr. Brown's symptoms as reported and the inconsistencies between his statements and the treatment records. Ultimately, Judge Grimes concluded that

> the claimant's allegations and the objective medical evidence support a finding that [Mr. Brown's] impairments cause some limitations in his ability to perform work-related activity. However, the undersigned further finds that the records as a whole, the opinion evidence, and the claimant's allegations and testimony supports a finding that the claimant retains the ability to perform work activity within the limitations described in the residual functional capacity assessment above.

*Id*. at 45.

## II. Legal Standard

This Court's scope of review in Social Security matters is incredibly narrow; it's limited to reviewing whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied. *Winschel v. Comm'r of Social Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id*. (internal citation and quotation marks omitted). But "[s]ubstantial evidence is *less* than a preponderance." *Meehan v. Comm'r of Soc. Sec*., Fed. Appx. 599, 601 (11th Cir. 2019) (quoting *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005)). "This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing

the evidence." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Thus, while the Court must scrutinize the record as a whole, **the Court must affirm if the decision is supported by substantial evidence, even if the evidence preponderates against the Commissioner's findings**. *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015) (quoting *Crawford v. Comm's of Soc. Sec.*, 363 F.3d 1155. 1158–59 (11th Cir. 2004) (per curiam)) (emphasis added); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

### III. Discussion

Mr. Brown contends the Court must remand this case because Judge Grimes did not support his finding that he isn't disabled with substantial evidence; Judge Grimes fact-finding procedure wasn't sufficient; and Judge Grimes applied the wrong legal standards. (Doc. 18 at 5). The Court addresses his arguments, as it understands them, below.

**A. Substantial evidence supports Judge Grimes's decision.**

As already noted, the Court's review here is incredibly narrow. That prevents the Court from weighing the evidence anew and upending an ALJ's decision.

Mr. Brown first contends that Judge Grimes mischaracterized certain facts regarding his lower back pain and that he wholly failed to address his March 14, 2013 MRI. (Doc. 18 at 5). On the latter contention, the Commissioner concedes that Judge Grimes failed to specifically mention Mr. Brown's MRI (Doc. 19 at 17). But,

the Commissioner contends, Judge Grimes explicitly reviewed it and found it unavailing based upon Dr. Hogan's RFC analysis. In other words, Dr. Hogan saw it and found it unpersuasive, and, in turn, Judge Grimes found her position persuasive.

The Court agrees with the Commissioner's contention here. Additionally, as noted above in Section I(B)(i), the medical records discussed show Mr. Brown underwent the subject MRI in 2013. Judge Grimes indicated in another way that considered this evidence at step three of his analysis, writing: "the claimant has the following severe impairments . . . degenerative disc disease 2013." (Doc. 13-3 at 41). To avoid confusion, the Court is satisfied, given Judge Grimes's explicit statement at step three mentioning Mr. Brown's back condition, coupled with his reliance upon Dr. Hogan's analysis that he explicitly considered–and found unpersuasive–the imaging from Mr. Brown's 2013 MRI. In any event, Judge Grimes wasn't under a "rigid requirement" to "specifically refer to every piece of evidence in his decision" as long as the Court could "conclude that [he considered the] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005). And the Court is satisfied of that.

On Mr. Brown's former point–that Judge Grimes mischaracterized medical records concerning his lower back pain–the Court finds no argument here, only a conclusion. (Doc. 18 at 5–6). For that reason, the Court finds any such claim abandoned. *See, e.g.*, *Ajomale v. Quicken Loans, Inc.*, 860 Fed. App'x. 670, 673

(11th Cir. 2021) (finding abandonment where appellant didn't plainly and prominently address issue at summary judgment); *Zuba-Ingram*, 600 Fed. App'x. at 656 (finding abandonment for failing to plainly and prominently raise issue on Social Security appeal); *Wright v. Kijakazi*, 2021 WL 4315800, at *3–4 (N.D. Ala. Sept. 22, 2021) (Social Security appeal); *Russell v. Saul*, 2020 WL 7025074, at *3 n.1 (N.D. Ala. Nov. 30, 2020) (same); *Proctor v. Soc. Sec. Admin., Comm'r*, 2020 WL 805947, at *4 (N.D. Ala. Feb. 18, 2020), *appeal dismissed sub nom. Proctor v. Comm'r, Soc. Sec. Admin.*, 2020 WL 3066702 (11th Cir. Apr. 28, 2020) (same) ("This sort of perfunctory identification of issues gives neither the Commissioner nor the court any guidance about [claimant's] argument aside from the fact that she asserts the existence of an error."); *Morgan v. Soc. Sec. Admin., Comm'r*, 2019 WL 1466259, at *3 (N.D. Ala. Apr. 3, 2019) (same). Further, insofar as Mr. Brown contends that Judge Grimes didn't give enough weight to his March 2013 MRI results when determining whether he was disabled and when determining his RFC, such an argument merely asks the Court to reweigh the record evidence and find in his favor. The Court can't and won't do that. *See Winschel v. Commissioner of Social Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir 2009))

Mr. Brown next presents a two-fold contention. First, he argues that Judge Grimes mischaracterized the evidence in the record because he didn't discuss several

medical records that showed he had positive straight leg testing on his left knee, other knee and back issues, and a finding that Mr. Brown had a reduced range of motion in his back. (Doc. 18 at 6). Second, Mr. Brown disagrees with Judge Grimes's assessment that his complaints were "routinely normal findings on examination." *Id*.

On his first point, Mr. Brown fails to explain exactly *how* Judge Grimes's failure to consider these records mischaracterizes the record as a whole. This, again, merits an abandonment finding. In any event, the Court echoes its earlier refrain: Judge Grimes wasn't required to specifically refer to every piece of evidence in the record. His decision will be upheld so long as the Court finds that he considered Mr. Brown's medical conditions as a whole. *Dyer*, 395 F.3d at 1211. And the Court finds he did here. (*See* Doc. 13-3 at 44) (Grimes, J., explaining that contrary to other records, Mr. Brown's most recent examinations showed a normal range of motion in his knees, hips, and back, and that he hadn't reported a pain score higher than a 3 out of 10).

On his latter point, as one can glean from Sections I(B)(i)–(ii) above, the most severe reports regarding Mr. Brown's pain came in March and December 2013. March 2013 was also the month that Mr. Brown underwent the MRI discussed above. Otherwise, Mr. Brown's pain levels never exceeded a 6 out of 10 (after 2011). In fact, in his later records, he never reported a pain score higher than a 5 out of 10.

He also reported that he wished to continue a conservative pain management plan and he had a normal range of motion in his knees, hip, and back as recently as 2020. These inconsistencies that Judge Grimes found are, to the Court, facially apparent. Accordingly, the Court finds that Mr. Brown's argument that Judge Grimes mischaracterized evidence of his knee and back pain fails, and those same records support, with substantial evidence, Judge Grimes's decision. *See Coheley v. Soc. Sec. Admin.*, 707 F. App'x 656, 659 (11th Cir. 2017) (recent treatment records showing claimant's improvement support ALJ's decision with substantial evidence).

Mr. Brown also contends that Judge Grimes mischaracterized the record because he found that Mr. Brown hadn't been advised to undergo surgery in 2013. (Doc. 18 at 6). That argument also rings hollow. As noted above, one treatment record indicates that Mr. Brown had "discussed the option of seeing a spine surgeon" some time before December 2013 with Jene E. Gertz. (Doc. 13-8 at 28). That note indicates that the two discussed the possibility that he speak with a spine surgeon, not that Mr. Brown actually received advice to undergo surgery. *Id.*

Mr. Brown claims that Judge Grimes mischaracterized evidence regarding his depression. (Doc. 18 at 7). Specifically, it appears that Mr. Brown believes that Judge Grimes shouldn't have relied on Dr. Robert Estock's assessment, finding Mr. Brown had no severe mental impairment. The Court is unpersuaded. First, the Court notes that Mr. Brown didn't allege that any mental impairment (severe or otherwise)

16

contributed to his disability. Nor did Mr. Brown mention that this condition was disabling during his administrative hearing. And it isn't clear to the Court that he's actually argued that any depression he's suffered from contributes to any disability now based on his Brief. (*See* Doc. 18 at 7–8).

In short, the smattering of evidence that relates to Mr. Brown's "somewhat" depressed state is insufficient to establish that it rendered him unable to work. And his failure to seek relief for this condition at the administrative level indicates it isn't worth reconsideration now. *See, e.g.*, *Godbee v. Astrue*, 2010 WL 2892725 (S.D. Ga. June 30, 2010) (ALJ didn't err by failing to consider claimant's purported impairment when she didn't include it on her benefits application *and* failed to testify about it before ALJ).

Mr. Brown also passingly mentions that Dr. Estock was a "non-examining physician." (Doc. 18 at 7). He remarks similarly in his Reply. (*See* Doc. 20 at 7). The Court understands these contentions to mean that neither Drs. Estock nor Hogan treated him, not examined him. To the extent Mr. Brown believes that their assessments are entitled to less weight for that reason, the Court disagrees. The Social Security Administration's governing regulations no longer impose a physician hierarchy for ALJs to consider. *See Thomason v. Soc. Sec. Admin., Comm'r*, 2021 WL 4061423, at *7 (N.D. Ala. Sept. 7, 2021).

Plaintiff's final contentions fair no better than those preceding them. His penultimate contention appears to be that Judge Grimes shouldn't have considered his statement that he could "live with his knee pain" when considering his residual functional capacity. (Doc. 18 at 8). But he doesn't explain why the ALJ shouldn't have considered that statement. Instead, he simply says,

> This again mischaracterizes the records, as it is in the clinical context of continuing complaints of pain and observed decreased range of motion testing. Mr. Brown does not assert that his knee pain is fatal, nor is that the issue for the ALJ's determination. Mr. Brown asserts that this statement should not be connected with his ability to perform any type of work.

(Doc. 18 at 8). There's a paucity of argument here. Thus, the Court finds any claim couched in the preceding paragraph abandoned. Mr. Brown's final three sentences on that page are equally unavailing for the same reasons.

## CONCLUSION

For the reasons above, Brown's requests for relief are **DENIED,** Judge Grimes's decision is **AFFIRMED**, Plaintiff's counsel's Motion to Withdraw (Doc. 20) is **DENIED AS MOOT**, and this matter is **DISMISSED WITH PREJUDICE.**

The Clerk of Court is **DIRECTED** to close the case.

**DONE** and **ORDERED** this March 28, 2022.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE